**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MICHELLE D. OLMOS,     )
                              )
           Plaintiff,   )
                              )
    v.                    )
                              )
                              )     1:12CV24
                              )
CAROLYN W. COLVIN,[1]   )
Commissioner of Social Security,  )
                              )
          Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle D. Olmos brought this action pursuant to

42 U.S.C. § 405(g), Section 205(g) of the Social Security Act, to obtain

judicial review of a final decision of the Commissioner of Social Security

denying her claim for a period of disability and disability insurance under

Title II and Title XVI of the Social Security Act. Doc. #2.  The administrative

record was certified to the Court for review.[2]  The parties filed cross-

motions for judgment on the pleadings. Docs. #10, 12.  On November 18,

---

[1]Acting Commissioner of Social Security Carolyn W. Colvin is substituted for Michael Astrue, the named Defendant at the time the instant action was filed. See Fed. R. Civ. P. 52(d).

[2]All references to the administrative record, filed manually with the Commissioner's Answer, are noted as "A.R."

2014, a hearing was held on the parties' motions.[3]  For the reasons

explained below, Plaintiff's Motion for Judgment on the Pleadings is

GRANTED, and Defendant's Motion for Judgment on the Pleadings is

DENIED.

## I.

Plaintiff applied for disability insurance benefits and for supplemental

security income on October 22, 2007, with an alleged disability onset date

of March 31, 2006. (A.R. 62-63, 97, 101.)  By letter dated October 14,

2009, Plaintiff amended her alleged onset date of disability from March 31,

2006, to October 24, 2007, and noted her willingness to amend further the

alleged onset date to May 30, 2008. (Id. at 16, 557.)  Plaintiff's claims

were denied initially and on reconsideration, after which Plaintiff requested

an administrative hearing. (Id. at 62-83.)  On September 30, 2009, Plaintiff

and her attorney[4] appeared before an Administrative Law Judge ("ALJ"). (Id.

at 30-61.)  In his decision dated January 8, 2010, the ALJ found that

Plaintiff was not disabled within the meaning of the Social Security Act.

---

[3]All references to attorney assertions and argument during the hearing
before this Court are referred to as "Tr."

[4]Plaintiff was represented by different counsel before the
Administrative Law Judge and this Court.

2

(<u>E.g.</u>, <u>id.</u> at 16.)  The ALJ's decision became the Commissioner's final

decision for purposes of judicial review when the Appeals Council denied

Plaintiff's request for review. (<u>Id.</u> at 1-6.)  In the instant action, Plaintiff

alleges that (1) the ALJ improperly evaluated her credibility and the medical

record which resulted in a Residual Functional Capacity ("RFC") finding

which is not supported by substantial evidence, (2) the ALJ improperly

assessed an opinion in violation of 20 C.F.R. § 404.1527, and (3) the ALJ

erred in determining that Plaintiff was capable of performing past relevant

work.[5] Doc. #11 at 1.

## II.

Federal law authorizes judicial review, albeit "extremely limited" in

scope, of the Social Security Commissioner's denial of social security

benefits. <u>See</u> 42 U.S.C. § 405(g); <u>Hines v. Barnhart</u>, 453 F.3d 559, 561

_____

[5]At the hearing before this Court, Plaintiff's counsel alleged that the "most significant error . . . has to do with the ALJ's finding regarding plaintiff's past relevant work." Tr. 4:7-9.  Plaintiff's counsel then argued that the second error involves the ALJ's failure to include in the RFC Plaintiff's social limitations that the ALJ found as part of his psychiatric review technique. <u>Id.</u> at 8:5-16.  Plaintiff's counsel alleged that the ALJ's third error was his weighing of the opinion of Plaintiff's therapist, Ms. Gerard-Collins. <u>Id.</u> at 14:6-7.  Some of Plaintiff's counsel's arguments at the hearing differ from those presented in Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings ("Memorandum").  While the Court will consider the arguments made at the hearing, Plaintiff's arguments will be addressed as they are presented in her Memorandum.

(4th Cir. 2006); Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "[A]

reviewing court must uphold the factual findings of the ALJ if they are

supported by substantial evidence and were reached through application of

the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir.

2012) (internal quotation and brackets omitted). "The issue before [the

Court], therefore, is not whether [Plaintiff] is disabled, but whether the

ALJ's finding that she is not disabled is supported by substantial evidence

and was reached based upon a correct application of the relevant law."

Craig v. Chater, 76 F.3d 585, 586 (4th Cir. 1996). "Substantial evidence

means 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34

(4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).

III.

Plaintiff first alleges that the ALJ improperly evaluated her credibility

and the medical record, resulting in an RFC finding[6] that is not supported by

substantial evidence. However, substantial evidence supports the ALJ's

credibility determination, evaluation of the medical record, and RFC finding.

---

[6]There appears to be no dispute as to Plaintiff's physical capabilities
and the related RFC findings.

4

The ALJ found that Plaintiff was sincere and fairly credible at the hearing and that her medically determinable impairments could reasonably be expected to cause the alleged symptoms. (A.R. 23.)  However, he found that Plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were somewhat inconsistent with the RFC assessment. (Id.)  "Because [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  To enable meaningful review, the ALJ's findings with regard to a claimant's credibility must "contain specific reasons . . . supported by evidence in the case record." SSR 96-7p, 1996 WL 374186, at *2.  Here, the ALJ provided specific reasons, all of which substantial evidence supports, for his credibility determination.

The ALJ noted that, at the hearing, Plaintiff testified "that she was disabled due to major depression, anxiety, PTSD, and panic disorder with agoraphobia." (A.R. 22.)  She "reported that she had full-blown attacks when she ventured in public by herself, or even when she was with

someone and was unfamiliar with the surroundings." (Id.)  She "reported

that she was nervous around other people; she had stress at home with her

children; and that she had 4 panic attacks weekly[7]." (Id.)  She testified "that

she became depressed when she had flashbacks from the abuse in her

childhood; if someone talked about issues that reminded her of the past; or

when people talked specifically about the claimant's past problems." (Id.)

She described "depressive symptoms of crying spells, severe depression for

2-3 days at a time; and social isolation.  The claimant stated that she had 2

episodes of severe depression in the past month . . . [and] reported mood

swings, confusion, and disorientation due to anxiety and depression." (Id.)

In addition, Plaintiff testified that she has "issues with being social"

"[i]f it's a place that [she is] not familiar with and if [she] is [alone]." (Id. at

45.)  She becomes "really nervous, jittery, and it's hard to breath, [she]

get[s] light-headed and basically [feels] like [she] just want[s] to pass out."

(Id.)  When her attorney asked, "Does that only happen when you're out in

public or in an unfamiliar type of place," Plaintiff responded, "If it's a

unfamiliar type of place." (Id.)  Plaintiff testified that she has "trouble

getting anxious" while at school "[u]sually" around strangers and she is

---

[7]Plaintiff actually testified that she could have panic attacks as often
as four times a week. (A.R. 48.)

"afraid to go up to them and talk to them." (Id. at 46.)  She testified that

her anxiety has become worse since working on her GED because there are

students who are grasping material more quickly than she, which

embarrasses her and she feels like she does not fit in. (Id. at 58.)  She said

that there are times that she becomes nervous at school, "get[s] stuck," and

tries her "best to figure it out on her own[,]" but is able to ask for help if she

"push[es] [her]self to get to that point to ask for help because . . . [she]

get[s] embarrassed . . . ." (Id. at 39.)  When asked if she has problems with

focus and concentration, Plaintiff testified that if she is stressed and goes

into a panic attack or if she goes into a deep depression, "it just totally

throws [her] off the base of things . . . daily tasks . . . .  It just throws [her]

off the track. [She is] not able to focus. [She has] a tendency to forget." (Id.

at 56.)  When asked if it made it difficult for her when she is trying to do

her work, she testified she "just basically [has] to get up from what [she is]

doing at school . . . [and] go outside or . . . to the bathroom" to remove

herself from the situation. (Id.)  She becomes overwhelmed "[e]specially if it

[is] something new" because "it just throws [her] off the track." (Id. at 57.)

She also testified that the "only [time] when [her depression] is triggered" is

when someone mentions her past, causing flashbacks of childhood issues.

7

(Id. at 53.)  A depressive episode involving a deep crying spell lasting up to three hours at a time "tends to slow [her] down in everything . . . . [She has] to push [herself] to do daily normal things." (Id. at 54.)

On the other hand, Plaintiff also testified about the progress that she has made.  The ALJ noted that she testified that, at the time of the hearing, she had been attending courses at Surry Community College four hours a day, five times a week for three months to earn her GED. (Id. at 36-37.) She had plans to take the GED test by November 2009. (Id. at 40.)  She testified that she attends parent-teacher conferences. (Id. at 41.)  On a daily basis, she had been taking her son to daycare and picking up her son and daughter from daycare. (Id. at 38.)  She stated that she has "[s]ome" panic attacks when she is out in public, "but they're not as bad as they have been." (Id. at 48.)  She explained that she learned from her therapist techniques to work through episodes when she feels "panicky." (Id. at 46-47.)  To stop panic attacks, she employs "thought-stopping" and has "learned to tell [herself] that this situation that is bothering [her] at the moment is not worth [her] going into full blown panic attack." (Id. at 48-49.)  Plaintiff testified that her therapist has taught her not to concern herself with what others around her think of her and that she is making

progress with her therapy. (Id. at 46-47.)  In addition to her therapist's

assistance, Plaintiff began receiving help from Stop Child Abuse Now

("SCAN") in early 2008. (Id. at 50.)  Plaintiff testified that she has had less

"trouble [with] her anxiety" since receiving help through SCAN. (Id.)  She

went as far as to state that SCAN's assistance "really has helped very

much" by implementing a daily routine and allowing Plaintiff to "reduce

stress a lot." (Id.)

## B.

The medical evidence supports Plaintiff's testimony that she has a

history of anxiety, panic attacks, and depression.  However, the medical

records, as well as Plaintiff's counseling records, reveal a more marked

improvement as a result of Plaintiff's active participation in her psychiatric,

medical, and therapeutic care than some of Plaintiff's testimony suggests.

The ALJ noted that the medical evidence of record reveals "a history of

treatment for mental impairments since October of 2007" during which

Plaintiff sought treatment from her primary care physicians before beginning

"psychiatric medication management and counseling therapy in May of

2008 . . . ." (Id. at 20.)  The ALJ explained that, generally, Plaintiff's

symptoms of depression, anxiety-related PTSD, and panic disorder include

"a depressed and anxious mood; panic attacks; flashbacks of childhood abuse; weight gain; feelings of guilt or worthlessness; difficulties concentrating; and occasional suicidal ideation." (Id.)  The ALJ included relevant information concerning Plaintiff's mental health from her primary care providers, psychiatrist Dr. Mark Chinn, therapist Helen Girard-Collins, and parent aide during the period between April 2006 and October 2009, the month after the hearing before the ALJ. (Id. at 20-22.)

The ALJ noted that records from Plaintiff's primary care providers from April 2006 to February 2008 reflect "intermittent episodes of chest pain related to anxiety; persistent complaints of stress; a flat affect; and mild anxiety.  However, in December 2007, the claimant was reported as calmer and less anxious;[8] and in March 2008 her physician stated that the claimant was still 'mildly anxious but better.'" (Id. at 21 citing Exs. 12F-15F, 17F-19F.)

Records from Dr. Chinn and Ms. Girard-Collins indicate Plaintiff "has experienced fairly consistent improvement in her mental symptoms since beginning formal mental health treatment in May of 2008." (Id.)  The ALJ

---

[8]Also in December, Plaintiff's primary care physician noted that Plaintiff was there for a "followup of her nerves" and was "doing much better" since she had been on medication for two weeks. (Id. at 259.)

explained that, although Dr. Chinn's notes describe Plaintiff as having a "mildly dysphonic mood and affect initially[,] . . . [l]ater records show an improvement in the claimant's mental status and functioning; in her ability to provide better care for her children; and to perform her activities of daily living.[9]  The records also show that due to mental stabilization the claimant was able to attend GED classes.[10]"  (Id. citing Exs. 14F-17F.)  Dr. Chinn noted in records from March through September 2009 "a good response to medication, and an improving mood and ability to manage anxiety."[11]  (Id.)

---

[9]For example, in May 2008, Dr. Chinn noted that Plaintiff "endorses having anxiety attacks, where she will get short of breath, feel dizzy, sweaty with chest pain, feel like she is falling. . . . [These symptoms] come on when she becomes very anxious trying to get things done in which she becomes upset or if she has to maintain herself in a crowd.  The episodes are fairly infrequent now since she has been in treatment with [medication]." (Id. at 551.)  In August 2008, Plaintiff reported to Dr. Chinn that she had "more panic attacks with storms or traffic or being around crowds." Dr. Chinn noted that Plaintiff's major depressive disorder had "improved with higher dose" of medication. (Id. at 523.)  Dr. Chinn noted in September 2008 that Plaintiff's depression had worsened, but medication was helping. (Id. at 500.)  In December 2008, Dr. Chinn noted that Plaintiff's depressive symptoms had improved with a combination of medication and therapy. (Id. at 477.)

[10]In July 2009, Plaintiff reported to Dr. Chinn that she was positive about starting her GED and that her mood and anxiety had improved since being back on her medications on a regular basis. (Id. at 428.)

[11]Specifically, in March 2009, Dr. Chinn noted that Plaintiff had a partial response to current medications for mood and anxiety symptoms and had significant additional improvement since beginning therapy. (Id. at 432.)

The ALJ explained that Dr. Chinn's mental status examination on September 24, 2009, "revealed a euthymic affect; good cooperation; no suicidal or homicidal ideation; and normal thought process. The claimant reported that she had experienced only 1 panic attack in the past 3 months. Dr. Chinn reported that . . . the claimant's mood symptoms and functioning continued to improve." (Id. citing Exs. 15F, 17F.)

The ALJ acknowledged that notes from Ms. Girard-Collins "also show a progressively improving mood and functioning from November of 2008 through September of 2009." (Id.) Although Plaintiff "exhibited a depressed mood, anxiety, and problems with concentration" in February 2009,[12] "the records also show active participation in therapy; and by July of 2009,

---

In May 2009, Plaintiff reported to Dr. Chinn that she believed her medications were helping. (Id. at 429.) In September 2009, Plaintiff told Dr. Chinn that her mood had been improving, as well as her anxiety. In the past three months, she had only one slight panic attack. She was proud of almost completing her GED, and she believed that her medications had been helping. (Id. at 427.)

[12]Plaintiff's therapy records from January and February 2009 also reflect that Plaintiff "said therapy helps her by teaching her different ways of responding to stressful situations" and that "she uses 'Thought stopping' and distraction to cope with thoughts" about her childhood. (Id. at 415, 416.) Plaintiff "reported feeling much better about herself and has been engaging in play out-of-doors with her children. [She] said she is planning to attend church with her children . . . ." (Id. at 414.) Ms. Girard-Collins also noted that Plaintiff "said she is feeling better with Therapy and is finding it easier to talk with people out in public." (Id. at 413.)

sustained efforts in self-improvement and control.[13]" (Id.)  The ALJ

explained that records from July 2009 "show that the claimant was enrolled

in classes; she was hopeful; and . . . 'seems able to manage stress of

classes, children, and extended family at this time.'"[14] (Id.)  The ALJ found

that "[a]s of September 8, 2009, the claimant reported better sleep; good

interaction with her children; progress in school; and improved interpersonal

relationships."[15] (Id.)   Ms. Girard-Collins "reported that the claimant

'appeared stable at this time.'" (Id. citing Exs. 14F-17F.)  Plaintiff's parent

aide, the director of a community service center, noted on October 6, 2009,

---

[13]In June 2009, Ms. Girard-Collins noted that Plaintiff was able to
respond to her mother in a positive way for the first time, and Plaintiff was
noted to have "Improved." (Id. at 412.)

[14]Also in July 2009, Plaintiff "seemed hopeful as she cooperates with
Work First to learn skills to be independent and to find a job. [She] appeared
to be excited about getting day care for the children and being able to
attend the Community College." (A.R. 411.)  Plaintiff was noted as showing
"Improvement," as opposed to "Regressed" or "No change." (Id. at 410,
411.)  In therapy notes from August 2009, she also described attending
school as a positive activity that made her feel good about herself. (Id. at
409.)  While her treatment notes for August 25, 2009, indicate she had
"Regressed" because she had been off her medication for a month due to
finances, her September 8, 2009, records indicate "Improvement." (Id. at
408, 409.) Her mood and anxiety continued to be manageable, and she
reported that her mood and anxiety had improved since being back on her
medications on a regular basis. (Id. at 428.)

[15]Plaintiff also stated that she enjoyed being out with her children. (Id.
at 408.)

13

that Plaintiff "successfully completed several goals; obtained her own

housing; received custody of her daughter; and had enrolled in a GED

program." (Id. at 22 citing Ex. 18F.)[16]

"After careful consideration of the evidence," the ALJ determined that

Plaintiff's mental impairments cause "mild to moderate work-related

functional limitations. However, the records also show that the claimant's

overall mental status and functioning has improved significantly since she

began mental health treatment." (Id. at 23.) The ALJ noted that Plaintiff

"has shown good overall compliance with her mental health treatment; her

---

[16]In addition to records from Plaintiff's primary care, psychiatric, and therapeutic treatment, records from New River Service Authority's Adult Community Support program reflect improvement in Plaintiff's mental health. In October and November 2008, with her new medication, Plaintiff reported feeling less stressed and a decrease in symptoms of depression and anxiety. (Id. at 490, 493, 497.) In December 2008, Plaintiff reported being able to get out more. She went to DSS, community college, grocery shopping, and her grandmother's residence one day. The following day, she went with her son to his preschool evaluation. Although she reported her anxiety level as a 3 (out of 5, with 5 being a panic attack), she also reported using some of the techniques she had learned for relaxation, and she knew it was helping. (Id. at 479.) In January and February 2009, Plaintiff reported that she was better able to handle her current stressors. (Id. at 467, 468.) By August 2009, she reported that she was "really doing well," she enjoyed attending school to obtain her GED, her mood was "up beat"[sic], and "getting out of the house is very motivating." (Id. at 442.) In September 2009, Plaintiff reported that her depression and anxiety levels were a 7 (out of 10, with 10 being the highest), but that she was "feeling well" and was "surprised at how her mood has been more upbeat since attending school with a structured daily schedule." (Id. at 439.)

medications appear to be working reasonably well; she is actively

participating in programs of self-improvement; and she has acknowledged

reduced stress in her personal and home life." (Id.)  Because substantial

evidence supports the ALJ's credibility determination, evaluation of the

medical record, and RFC finding, there is no error with respect to this

alleged issue.

Before analyzing the next alleged issue, it is important to address

Plaintiff's repeated contention that the ALJ "hold[s] . . . against her" the

positive steps she has taken and goals she has achieved when he finds her

not disabled despite medical evidence and Plaintiff's testimony that she still

struggles with anxiety and panic attacks. Doc. #11 at 6, 7.  Plaintiff's

presentation of the evidence in her Memorandum suggests that she is more

disabled than a close reading of the medical records and Plaintiff's testimony

before the ALJ actually supports, as explained above.[17]  A careful review of

---

[17]For example, in her Memorandum, Plaintiff's counsel states, "Ms.
Olmos testified that her doctors felt she needed in-home therapy because of
her disability about being in public." Doc. #11 at 5.  Plaintiff's counsel
further states, "Ms. Olmos' requirement for in-home therapy is indicative of
the seriousness of her anxiety from being in public and around others." Id.
However, both Plaintiff's testimony and the records reflect that her health
care providers initially recommended group therapy, in which Plaintiff
participated, but that Plaintiff thereafter requested in-home therapy. (A.R.
49, 505.)  Plaintiff's physicians did not "fe[el] that she needed in-home
therapy because of her disability about being in public," and Plaintiff did not

Plaintiff's testimony and the medical records reflects that Plaintiff experiences anxiety and panic attacks, but as a result of her active participation in and commitment to therapy and life-skills services and consistent medication management, Plaintiff has learned to use and regularly employs techniques to lessen stress and avoid anxiety and panic attacks. The ALJ recognized that, as a result of Plaintiff's progress, she is not as disabled as she alleges. As the ALJ noted, Plaintiff "has shown great progress with her therapist . . . . [and] has learned techniques to overcome her anxiety and depressive symptoms, so that she can continue to function in spite of them." (A.R. 23.) She is commended for her efforts and progress, but this certainly does not support Plaintiff's allegation that the ALJ used her progress against her.

IV.

Plaintiff next alleges that the ALJ erred by improperly assessing the opinion of Ms. Girard-Collins in violation of 20 C.F.R. § 404.1527. The ALJ is required to consider medical opinions and other relevant evidence he receives. See 20 C.F.R. § 404.1527(b); SSR 06-03p. Although Ms. Girard-

---

testify to that, as Plaintiff's counsel argued.

Collins is not an "acceptable medical source,"[18] the ALJ may use her opinion "to show the severity of [Plaintiff's] impairment(s) and how it affects [Plaintiff's] ability to function" and must consider it when evaluating an "acceptable medical source's" opinion. SSR 06-03p. Factors for evaluating Ms. Girard-Collins' opinion include how long she has known Plaintiff, how frequently she has treated Plaintiff, how consistent the opinion is with other evidence, the degree to which she presents relevant evidence to support an opinion, how well she explains the opinion, whether she is a specialist in an area related to Plaintiff's impairment, and any other factors that tend to support or refute the opinion.[19] Id.; see also 20 C.F.R. § 404.1527(c). "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03p. "Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." Id.

---

[18]Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[19]The factors in 20 C.F.R. § 404.1527(d) explicitly apply to the evaluation of "acceptable medical sources'" opinions; however, they can be applied to other opinion evidence. SSR 06-03p.

As described above, supra p. 12-14, the ALJ noted that records from Ms. Girard-Collins "show a progressively improving mood and functioning from November of 2008 to September of 2009." (A.R. 21.) See also supra p. 12-14 n. 12-15. However, on September 25, 2009, five days prior to the hearing before the ALJ, Ms. Girard-Collins wrote a letter of support that became part of the record before the ALJ that paints a different picture of Plaintiff. (A.R. 29, 434-35.) In it, she stated that Plaintiff has been diagnosed with "Major Depressive Disorder, recurrent, severe and Post Traumatic Stress Disorder." (Id. at 435.) She explained that Plaintiff "has anxiety or panic attacks in which she feels short of breath, dizzy, sweats, has chest pains and feels like she is falling." (Id.) According to Ms. Girard-Collins, "[t]his severely restricts [Plaintiff's] ability to be out in public as panic attacks happen suddenly and without warning." (Id.) Ms. Girard-Collins further opined that Plaintiff's "ability to function in a public employment [sic] would be severely limited by her mental health disability." (Id.) Plaintiff "tends to worry excessively when out in public" and "has been unable to sustain more than short periods of time for needed shopping in stores and for doctors appointments." (Id.) Plaintiff's "intense fears and intrusive thoughts make it difficult for her to concentrate." (Id.) Plaintiff's

18

"intense psychological distress would not, in my opinion, allow her to perform effectively in a public work environment." (Id.) Ms. Girard-Collins closed her letter by recognizing that Plaintiff "has demonstrated a willingness to improve her life" by working to obtain her GED and participating in therapy, and setting a goal of feeling good about herself and gaining control of her life. (Id.)

After reviewing the evidence of record, the ALJ noted that he had "given substantial weight to the medical assessment of the claimant's therapist as to the claimant's diagnoses and symptoms; but not to the therapist's ultimate conclusion that the claimant is incapable of working." (Id. at 24.) He then stated that "[t]he underlying therapy notes document great progress in the claimant's mental symptoms during a 10-month period of psychotheraphy . . . " (Id.)

Although the ALJ did not explicitly identify the factors from SSR 06-03p that he used to weigh Ms. Girard-Collins' opinion, it is evident from his decision that his evaluation included the length of the time that Ms. Girard-Collins treated Plaintiff, the frequency of treatment, the consistency of Ms. Girard-Collins' opinions with other evidence, the degree to which Ms. Girard-Collins presented relevant evidence in support of her opinions, and how well

she explained her opinions, among other factors.  In his decision, the ALJ

acknowledged that Ms. Girard-Collins had treated Plaintiff from November

2008 to September 2009 and noted both Plaintiff's subjective reports to

Ms. Girard-Collins and Ms. Girard-Collins' assessments of Plaintiff during

that time. (Id. at 21.)  He repeated throughout his opinion that he carefully

reviewed the entire record (see, e.g., id. at 20) which included Ms. Girard-

Collins' treatment notes, as well as her September 25, 2009, letter (see  id.

at 20-22, 24, 28-29).  It is clear from the evidence and from the ALJ's

decision that some of Ms. Girard-Collins' assertions in her September 25,

2009, letter are inconsistent with the other evidence of record, including

Ms. Girard-Collins' own treatment notes.  There is no error in the ALJ's

assessment of and weight attributed to Ms. Girard-Collins' opinion.

V.

Plaintiff next argues that the ALJ erred in determining that Plaintiff

was capable of performing past relevant work.  Plaintiff focuses her

argument on the ALJ's statement that "[t]his job is described in the

Dictionary of Occupational Titles (DOT) as requiring medium exertion, and it

is classified as unskilled in nature" after which he concluded "that due to

the claimant's remaining [RFC] for a wide range of unskilled medium work

20

activity, . . . she can perform the requirements of her past relevant work as she actually described it" (id. at 24). Doc. #11 at 12-13.  Plaintiff alleges that the ALJ erred by failing to consider the requirements of an automobile parts factory inspector, as actually or generally performed, failing to cite a DOT job code, failing to elicit testimony from a vocational expert, and failing to carefully consider the requirements of Plaintiff's past relevant work.

At Step Four of the ALJ's five-step evaluation process, he determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. § 404.1520(f).  Past relevant work is work performed, either as the claimant actually performed it or as it is generally performed in the national economy, within the last fifteen years or fifteen years prior to the date that disability must be established.  The work also must have lasted long enough for the claimant to have learned to do the job and have been substantial gainful activity. Id. at § 404.1560(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. Id. at § 404.1572(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is actually realized. Id. at § 404.1572(b).  At Step Four, the claimant still bears the burdens of production and proof. Pass v. Chater, 65 F.3d 1200, 1203

(4th Cir. 1995).

A.

At the hearing before this Court, Plaintiff's counsel argued that the failure of the ALJ to provide a DOT code is significant. Tr. 4:14-16. Plaintiff's counsel then chose two jobs from the DOT that she thought were closest to Plaintiff's past relevant work to argue that both of those jobs require more than unskilled work, Plaintiff's RFC limitation. Id. at 5:15-7:2. The ALJ found that Plaintiff could do her past relevant work as she described having actually performed it. Therefore, there was no need for the ALJ to refer to the DOT or invite testimony from a vocational expert to determine how the work is generally performed. Pass, 65 F.3d at 1207 ("Having found that Pass could perform his job as he did in the past, it is unnecessary to consult the DOT in order to determine whether Pass would be able to perform the position of gate guard as it currently exists in the national economy.") cited in Finney v. Astrue, No. 1:11CV109, 2014 WL 204213, *6 (M.D.N.C. Jan. 17, 2014) adopted, 2014 WL 791848 (M.D.N.C. Feb. 25, 2014) & aff'd, No. 14-1404, 2014 WL 6845359 (4th Cir. Dec. 5, 2014) (per curiam).

Furthermore, "[t]he claimant is the primary source for vocational

documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work." SSR 82-62. Here, Plaintiff testified that her last full-time job was in 2006 at Lydol, a company that made heat shields for vehicles, where she worked as an inspector.[20] (A.R. 41-42.) "As the parts would come off the [production] line, [she] would inspect them and keep track of the good and the bad parts. [She] would say if there were so many parts that had to be thrown out because they were bad . . . ." (Id. at 42.) She would "then pack them and keep count of how much was packed and shipped." (Id.) She had "paperwork [she] had to do and if there were so many bad [she] would have to put down why they were bad and how much parts went out that night."[21] (Id.)

On her Work History Report, Plaintiff similarly described her job at Lydol. "I inspected parts that [came] off [the] line to make sure there were

_____

[20]The ALJ used Plaintiff's job at Lydol as her past relevant work. (See, e.g., A.R. 22.) At the hearing before this Court, Plaintiff's counsel stated, "I believe that the ALJ went back to the inspector job . . . , because some of the jobs that she performed after that, there was a concern of whether or not they were performed long enough in order to be able to learn them and to be considered past relevant work . . . ." Tr. 11:23-12:2. See 20 C.F.R. 404.1560(b).

[21]Plaintiff also testified about the physical demands of her job at Lydol, but those are not at issue.

23

no crack[s] & [that they were] cut right (inspected part all over & [gauged] them[)]. Keep count of bad (scrap) [and] how much [I] packed. I had to pack parts of for shipment. Do paper work on production." (Id. at 153.) She answered "Yes" to questions asking if she (1) used machines, tools, and equipment, (2) used technical knowledge or skills, and (3) did any writing, completed reports, or performed duties like this. (Id.) She stated that she supervised three people eight hours a day, but did not make hiring or firing decisions and was not a lead worker. (Id.) She further explained, "I also worked on line trans[ferring] parts from a station to another station on the machine. While I was there I also trained [people] on different kinds of machines. As well as inspecting parts."[22] (Id. at 154.) The ALJ had before him Plaintiff's testimony, along with a detailed description in her Work History Report, of her past relevant work at Lydol as she actually performed it. There was no need to obtain information from the DOT or a vocational expert about the requirements of the work as generally performed in the economy.

---

[22]The Social Security Administration worked with Plaintiff to complete a Disability Report that includes a description of her work at Lydol similar to the description in the Work History Report. (A.R. 138.) However, in the Disability Report, it states that Plaintiff did not supervise other people. (Id.) There is also no mention of Plaintiff training others, as she stated in the Work History Report. (Id.)

B.

As noted above, at Step Four, the claimant still maintains the burden of proving that she cannot perform her past relevant work.  Here, it is questionable whether or not Plaintiff has done so.  She did not testify that she stopped working at Lydol because of her mental health nor did she testify that she could not, at the time of the hearing, perform the work she did at Lydol.  Instead, she testified that she was "basically fired because a lack of transportation.  Couldn't get back and forth." (A.R. 42-43.)  She also testified that her job at Lydol was the best job she had ever had because it kept her busy and was fast-paced. (Id. at 43.)

At the hearing before this Court, Plaintiff's counsel was asked where, in the record, Plaintiff says, "I can't do that job I was doing before because of X." Tr. 11:2-4.  Plaintiff's counsel responded, "Mainly her biggest -- as she noted why she wasn't able to do that job or any job was because of her panic attacks.  Those are documented. . . . She breaks down.  She has a racing heart beat, blurred vision, she can't function." Id. at 11:5-11.  Plaintiff's counsel was asked if Plaintiff was "having those difficulties while she was doing her job [at Lydol]," to which counsel responded, "No.  This is something that developed later.  She alleged onset disability a couple of

years after she was, I believe -- " Id. at 11:15-19. The Court completed

counsel's sentence, "Terminated for not having a car?" Id. at 11:20.

In fact, in July 2005, Plaintiff reported to her health care provider at

Yadkin County Health Department that she was working at Lydol and since

becoming pregnant she had experienced chest pain and shortness of breath

while at work only. (A.R. 322.) "Depression" was also noted as part of her

medical history at the time. (Id.) Plaintiff also testified that she did suffer

from anxiety while working at Lydol, (id. at 43), and yet she did not quit

working due to anxiety, chest pain, shortness of breath, or depression.

Plaintiff's counsel also argued at the hearing before this Court that

Plaintiff quit a job she had after her job at Lydol "because of her limitations."

Tr. 11:22-23. "There were some jobs in between where she was trying to

do other things and eventually just had to call it quits." Id. at 12:11-13.

The Work Activity Report reflects that Plaintiff reported to the Social

Security Administration that she stopped working or reduced her hours at

jobs she held from the summer of 2006 to October of 2007 because "of my

medical condition." (A.R. 124-130.) However, the medical condition is not

specified, and Plaintiff clarified in the Disability Report that the medical

condition responsible for her leaving Wayne Poultry in June 2007 was her

thyroid issue. (Id. at 136.)  She stated that she left the other jobs because

"she got sick," but did not explain further what she meant. (Id.)

       In addition, Plaintiff did not testify that she was unable to do any of

the jobs after Lydol because of her mental health.  Her counsel at the

hearing before the ALJ asked, " . . . [Y]ou said that you – some anxiety also

was – work contributed somewhat to your stopping work. . . . Can you

describe what symptoms of anxiety you had or what you mean by that?"

(Id. at 44.)[23]  Plaintiff asked a clarifying question, "The symptoms I have

currently?" to which her counsel responded in the affirmative. (Id.)  Plaintiff

then described "issues with being social" when she is in a "place that [she

is] not familiar with . . . ." and that she has someone with her when goes

out in public, with the exception of when she goes to school. (Id. at 45.)

Not only does Plaintiff's testimony not support her argument that she is

incapable of performing her past relevant work, but neither do her medical

records.

       The only references in Plaintiff's medical records to her inability to

_____

       [23]Plaintiff's counsel at the hearing before the ALJ mischaracterized
Plaintiff's testimony about stopping work.  Plaintiff had just finished
testifying that she had anxiety while at Lydol, but that it was her best job
and was fast-paced and she was fired for lack of transportation. (Id. at 42-
43.)

work do not support Plaintiff's argument. In July 2007, Plaintiff was treated at Yadkin Medical Associates for severe hypothyroidism, which had gone untreated the year prior. (Id. at 265-267.) She reported having dizzy spells, apparently related to her untreated hypothyroidism, and her physician prescribed medication. (Id.) She described feeling better than at her visit approximately two weeks prior, but was still having intermittent dizzy spells. (Id. at 266.) Plaintiff reported that she had been working at Wayne's Poultry for three months on a production line where she was required to cut up about thirty chickens per hour. (Id.) She felt like she was not able to fulfill that requirement at the time of her doctor's visit and wanted to be written out of work for a few days. (Id.) The doctor wrote her out of work from July 9 through July 18, increased her thyroid medication, and scheduled a return appointment for July 18. (Id.) On July 18, 2007, Plaintiff returned to the doctor and reported doing better as far as her energy level, but she still would get "dizzy headed" with sudden changes in position. (Id. at 265.) She reported not being ready to return to work "because she works in the poultry industry in production." (Id.) The doctor wrote her out of work for two weeks and scheduled a return appointment. (Id.) When Plaintiff returned to the doctor on August 1, 2007, she reported

feeling much better and was ready to return to "regular work." (Id. at 264.)

Plaintiff's need to remain out of work in July 2007 for several weeks was a

result of her untreated hypothyroidism, not as a result of her anxiety or its

symptoms.

In addition, in June 2009, Plaintiff's community support aide through

New River Services Authority's Adult Community Support program was

assisting Plaintiff in preparing to find employment through the Work First

Program. (E.g., id. at 445-47.)  However, on June 19, 2009, Plaintiff,

accompanied by her community support aide, met "urgently" with Dr. Chinn

"stating she is starting in the Work First Program" and "requesting a note

today that she is unable to work." (Id. at 431.)  Dr. Chinn's note continues,

"The last time she worked on a regular basis was four months in late 2007,

working with chickens, and she notes after that time, she began having

health problems, as well as increased anxiety and has not returned to work

force since then. . . . She continues to have mild depressive symptoms and

anxiety but these have been manageable." (Id.)  Dr. Chinn notes that

Plaintiff is "fearful of returning to work." (Id.)  Dr. Chinn "discussed that the

work may be anxiety provoking but may have significant benefits for her,

including increasing social interaction with others, structure, time away from

29

her constant childcare, likely benefit greatly her mood and self-esteem and confidence and with support of the Work First Program, as well as initially limiting her hours, she will have the support to reenter the workforce gradually." (Id.)  Dr. Chinn indicated on Plaintiff's form for Social Services that "she would currently be able to work 20 hours a week for the next 60 days and then may be able to continue on a full-time basis after that point." (Id.)  Instead of working, though, Plaintiff chose to pursue her GED. (Id. at 428.)  Dr. Chinn's notes do not reveal concern that Plaintiff could not work due to her mental health impairments.  Instead, Dr. Chinn's notes reflect Plaintiff's improving mental health status, see supra n. 9-11 & accompanying text, and her "fear" of returning to work after being out of work for approximately two years.  Dr. Chinn's notes suggest that he believed she was capable of returning to work, particularly if she could slowly adjust to participating in the workforce.

At the hearing before this Court, Plaintiff's counsel asserted that Plaintiff's past relevant work "involves significant social contact with supervisors and coworkers for purposes of filling out . . . reports, and explaining there are defects in the parts." Tr. 12:19-22.  She explained that Plaintiff "has to bring the report to her supervisor and explain herself as to

why this part is defective" and that Plaintiff "is around coworkers constantly in the setting of a factory." Id. at 12:25-13:2, 13:4-5. In response to the Court's inquiry, "Does she talk about dealing with others or interacting?," counsel responded that Plaintiff "did talk about her supervisors." Id. at 13:14-16. Neither Plaintiff's Work History Report, Disability Report, or testimony describes reporting to a supervisor and explaining herself. (See A.R. 41-42, 138, 153-54.) Counsel then acknowledged that, as for the "coworker part," she was "partly making an assumption" because Plaintiff worked on an assembly line. Tr. 13:16-20. Other than conflicting references to Plaintiff's supervising and training workers, (A.R. 138, 153-54), there is no evidence as to her interactions otherwise with coworkers on the assembly line. In sum, Plaintiff's counsel's argument before this Court that Plaintiff's work at Lydol "involves significant social contact with supervisors and coworkers for purposes of filling out . . . reports, and explaining there are defects in the parts" is not supported by the evidence.

Among the reasons that it is unclear whether or not Plaintiff met her burdens of production and proof is the ALJ's characterization of Plaintiff's past relevant work as unskilled. (See A.R. 24.) Because the ALJ limited Plaintiff's RFC to unskilled work, he found that Plaintiff could perform the

requirements of her past relevant work and, therefore, was not disabled.

"Unskilled work" is defined as

work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Social Security Commission] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing, or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

20 C.F.R. § 404.1568(a). The regulations define "semi-skilled work" as

work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

Id. at § 404.1568(b).

Plaintiff's testimony and her completed Work History Report more

closely describe Plaintiff's work at Lydol as semi-skilled work, rather than

unskilled work. Compare A.R. 41-42, 147-54 with 20 C.F.R. § 404.1568(a)

& (b). Because substantial evidence supports the ALJ's RFC finding, if

Plaintiff's past relevant work is more accurately characterized as semi-skilled,

then Plaintiff may not be able to perform the requirements of her past relevant work because the past relevant work requires the performance of work-related activities precluded by her RFC.  Accordingly, the case is remanded to the ALJ so that he may either provide an explanation supported by substantial evidence as to why he finds Plaintiff's past relevant work to be unskilled or a reevaluation of Plaintiff's past relevant work to reclassify it so that he may determine if that work requires performance of work-related activities precluded by her RFC.

VI.

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings is GRANTED, Defendant's Motion for Judgment on the Pleadings is DENIED, and the case is remanded to the ALJ as instructed above.

This the 29th of December, 2014.

    /s/ N. Carlton Tilley, Jr.
Senior United States District Judge